UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|                              |   |                           |
|------------------------------|---|---------------------------|
| NANCY ELLEN PICKET           | : |                           |
| v.                           | : | CIV. NO. 3:13CV1295 (HBF) |
| CAROLYN W. COLVIN,           | : |                           |
| COMMISSIONER, SOCIAL SECURITY | : |                          |
| ADMINISTRATION               | : |                           |

RECOMMENDED RULING ON CROSS MOTIONS

This action was filed under § 1631(c)(3) of the Social
Security Act ("the Act"), 42 U.S.C. § 1383(c)(3), to review a
final decision of the Commissioner of Social Security ("the
Commissioner"), denying plaintiff's claim for disability
insurance benefits ("DIB") and supplemental security income
("SSI"). Plaintiff Nancy Ellen Picket moves for judgment on the
pleadings to reverse or remand the Commissioner's decision [Doc.
#12], while the Commissioner moves to affirm. [Doc. #17].   For
the reasons that follow, plaintiff's motion for judgment on the
pleadings [**Doc. #12**] is **GRANTED**.  Defendant's Motion to Affirm
[**Doc. #17**] is **DENIED.** This matter is remanded to the
Commissioner for further proceedings in which the ALJ evaluates
and explains the weight to be given to the non-treating
physician opinions.

I.   **LEGAL STANDARD**

The scope of review of a social security disability
determination involves two levels of inquiry.  The court must
first decide whether the Commissioner applied the correct legal

1

principles in making the determination.  Next, the court must
decide whether the determination is supported by substantial
evidence.  <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998).
Substantial evidence is evidence that a reasonable mind would
accept as adequate to support a conclusion; it is more than a
"mere scintilla."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401
(1971); <u>Yancey v. Apfel</u>, 145 F.3d 106, 110 (2d Cir. 1998).  The
substantial evidence rule also applies to inferences and
conclusions that are drawn from findings of fact.  <u>Gonzales v.
Apfel</u>, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); <u>Rodriguez v.
Califano</u>, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may
not decide facts, reweigh evidence, or substitute its judgment
for that of the Commissioner.  <u>Dotson v. Shalala</u>, 1 F.3d 571,
577 (7th Cir. 1993).  The court must scrutinize the entire
record to determine the reasonableness of the ALJ's factual
findings.  In reviewing an ALJ's decision, the court considers
the entire administrative record.  <u>Perez v. Chater</u>, 77 F.3d 41,
46 (2d Cir. 1996).  The court's responsibility is to ensure that
a claim has been fairly evaluated.  <u>Grey v. Heckler</u>, 721 F.2d
41, 46 (2d Cir. 1983).

     Where there is a reasonable basis for doubt whether the ALJ
applied correct legal principles, application of the substantial
evidence standard to uphold the ALJ's decision "creates an
unacceptable risk that a claimant will be deprived of the right
to have h[is] disability determination made according to correct

legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1987)(citation and quotation marks omitted).  To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record.  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).  Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding.  Peoples v. Shalala, No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. Nov. 4, 1994); see generally Ferraris, 728 F.2d at 587.

## II. ADMINISTRATIVE PROCEEDINGS

The parties do not dispute this matter's procedural history. Plaintiff filed concurrent applications for DIB and SSI on June 14, 2010, alleging disability beginning January 1, 2009[1]

---

[1] There appears to be some confusion with respect to plaintiff's alleged onset date. Plaintiff's applications and the Administrative Law Judge's opinion both reference an alleged onset date of January 1, 2009. See Tr. 153-63, 20. However, plaintiff's brief states that plaintiff amended her onset date to May 17, 2010 at the administrative hearing. [Doc. #13, 2]. The record further reflects a letter dated October 20, 2011, from plaintiff's counsel requesting the Office of Disability Adjudication and Review to amend the alleged onset date from January 1, 2009 to May 17, 2010. (Tr. 287). At the hearing, plaintiff's counsel noted that plaintiff "has an alleged onset date of May 17, 2010." (Tr. 33).

3

(Certified Transcript of the Record, Compiled on January 13, 2014 (hereinafter "Tr.") Tr. 153-63). Both applications were denied initially on August 18, 2010 (Tr. 86-93)[2], and on reconsideration on March 21, 2011. (Tr. 97-111). Plaintiff then requested a hearing before an Administrative Law Judge (Tr. 120-21), which the SSA acknowledged via letter dated May 4, 2011 (Tr. 112-19).

On January 6, 2012, Administrative Law Judge ("ALJ") Deirdre Horton held a hearing at which plaintiff, represented by an attorney, testified. (Tr. 29-49, 94-95, 122-52).  On February 10, 2012, the ALJ issued an unfavorable decision. (Tr. 15-28). On July 2, 2013, the Appeals Council denied plaintiff's request for review thereby making the ALJ's February 10, 2012 decision the final decision of the Commissioner. (Tr. 5-11).  Plaintiff filed this timely action for review of the Commissioner's decision.[3]

III.    **SUBSTANTIVE EVIDENCE**

A. ***Hearing Testimony***

Plaintiff was born in 1967. (Tr. 34). At the time of the hearing she was forty four (44) years old. (Tr. 34). Plaintiff has never been married, but lives with her two children, ages twenty six (26) and twenty one (21), and their father. (Tr. 34).

---

[2] The notice of decision states that plaintiff alleged disability due to diabetes, kidney problems, stomach troubles, and back pain. (Tr. 86, 90).

[3] The Appeals Council granted plaintiff additional time to file a civil action. (Tr. 1-4).

Although plaintiff drives, her boyfriend drove her to the hearing. (Tr. 35).  Plaintiff testified that due to troubles with her eyesight and lethargy, she usually has a friend drive her. (Tr. 35). Plaintiff stated that she does not "really go out that much" and she has "[s]omebody with [her] most of the time." (Tr. 35). Plaintiff is about six feet tall, but was unsure of her weight at the time of the hearing. (Tr. 35-36).

Plaintiff testified that she is unable to work due to her diabetes and back pain as a result of poor kidney function. (Tr. 36). She experiences "excruciating pain" and has trouble standing for more than ten (10) minutes before her back starts "hurting really bad." (Tr. 36). Plaintiff testified that she has been hospitalized three or four times, including one stay in the ICU, due to high blood sugar levels and ketoacidosis. (Tr. 36-37). Plaintiff testified that she had trouble standing at work, and could not complete a four or five-hour shift. (Tr. 37). Plaintiff's pain travels down the back of her legs, to the point that her legs would "give out on [her]" when she was walking. (Tr. 37). Plaintiff also experiences fatigue and has trouble getting up in the morning. (Tr. 37). Plaintiff testified that she frequently called out of work because she could not walk or stand up. (Tr. 37).

With respect to her back pain, plaintiff is able to stand for ten (10) minutes before experiencing pain that radiates down both legs. (Tr. 38). Plaintiff describes her pain as "really bad

spasms, but it feels more also like organ pain" in the area of her kidneys. (Tr. 38-39).  To relieve this pain, plaintiff has to lie down. (Tr. 38-39). Plaintiff also experiences back pain after sitting for more than ten to fifteen minutes. (Tr. 39). To relieve this pain, she needs to stretch or lie down. (Tr. 39). Plaintiff testified that she mostly lies down all day because she cannot do anything else. (Tr. 39). She cannot lift more than ten (10) pounds without it hurting her lower back. (Tr. 39-40). Plaintiff is unable to perform many household chores because of her back. (Tr. 40). She testified that she will try to wash dishes, but after five or ten minutes experiences back pain. (Tr. 40).

With respect to her diabetes, plaintiff testified that her blood sugar falls at night, which causes disorientation, sweating, and decreased vision. (Tr. 41). Plaintiff states her blood sugar is "so out of control." (Tr. 41).  When her blood sugar becomes elevated plaintiff feels "weak" and "like [she is] in a coma." (Tr. 42).  Her body begins to ache; she experiences dry-mouth and sometimes vomits. (Tr. 42). In the year leading to the hearing, plaintiff was hospitalized three or four times because of her high blood sugar and was placed in the ICU a "few times." (Tr. 42-43). Plaintiff's high blood sugar has affected her kidneys; plaintiff testified that twenty-five percent of her kidney is not working. (Tr. 43). Plaintiff testified that she has been taking insulin for about twenty (20) years. (Tr. 48).

She further testified that her problems with blood sugar started about two or three years ago, and the condition happens even though she is taking her insulin. (Tr. 48). Plaintiff also testified that she experiences anxiety attacks and suffers from depression, for which she was recently prescribed an antidepressant. (Tr. 38).

Plaintiff usually wakes up around 11:00 A.M. or noon, takes her insulin, eats something, and then sits or lies down for the most of the day. (Tr. 43-44). She has problems getting up in the morning and sometimes cannot take a shower because she has no energy. (Tr. 43). Plaintiff takes insulin four (4) times daily by injection. (Tr. 44). She has no hobbies. (Tr. 44). Plaintiff does not need help taking care of herself, except when her blood sugar is low and her boyfriend will retrieve her juice or toast. (Tr. 44). Plaintiff experiences elevated blood sugar levels on a daily basis. (Tr. 45-46). On these days, she feels disoriented and nauseous and will stay in bed. (Tr. 45). She tries not to leave the house on account of feeling faint. (Tr. 45).

Plaintiff worked as a cashier at a supermarket for twenty three years. (Tr. 46-47). She stopped working because she could not stand anymore due to pain.  (Tr. 47). Plaintiff testified that she was unable to complete a twenty (20) hour per week work schedule, and called in sick once or twice per week. (Tr. 47).

**B.   *Activities of Daily Living report dated September 18, 2010 (Tr. 269-79)***

On September 18, 2010, plaintiff completed an activities of

7

daily living report.  Plaintiff lives in a Co-Op with family.
(Tr.  269). On a typical day she will take her medicine, eat,
and shower. If she is able, she will also perform chores and
cook. (Tr. 269).  Plaintiff reports that her children's father
performs most of the chores. (Tr. 270). Before plaintiff's
condition/illness she was able to stand and sit for more than
thirty minutes at a time and do more things for herself without
depending on others.  (Tr. 270). Her condition/illness also
affects her sleep. (Tr. 270). Plaintiff is able to prepare her
own meals, mostly sandwiches, but reports she does not cook as
much since her condition/illness began. (Tr. 271).  Plaintiff is
able to wash dishes and, when not "in severe back pain," able to
make the bed. (Tr. 272). Plaintiff reports needing help with
household chores "a lot." (Tr. 272).

    Plaintiff goes outside only when needed. (Tr. 272). She is
able to go out alone and shop in stores for personal hygiene
items and food. (Tr. 272-274).  Plaintiff can count change,
handle a savings account, and use a checkbook. (Tr. 274).
Plaintiff reports not having hobbies, but will watch TV "once in
a while." (Tr. 274).

    Plaintiff reports that her condition/illness affects her
ability to lift, squat, bend, stand, walk, sit, kneel, climb
stairs, see, and concentrate. (Tr. 275).  She reports difficulty
walking due to severe leg pain and an inability to sit or stand
for long periods of time. (Tr. 275). Plaintiff's erratic blood

sugar levels affect her eyesight, memory and concentration. (Tr. 275). However, when she is "feeling okay" she has no problem paying attention. (Tr. 276). Plaintiff is able to follow instructions and gets along well authority figures. (Tr. 276). Plaintiff reports taking Humalog insulin, Lantus insulin, Lisinopril[4], and Simulstatin. (Tr. 227).

### C.   Medical Evidence

Plaintiff alleges she is disabled on account of a number of physical impairments. A summary of the relevant medical evidence in the record follows.[5]

### 1.   Bridgeport Hospital Records

Plaintiff presented to Bridgeport Hospital on October 16, 2009, due to twenty four hours of abdominal pain and nausea. (Tr. 362). Her past medical history includes hypertension, poorly controlled diabetes, chronic kidney disease, hyperlipidemia, obstructive sleep apnea, and morbid obesity. (Tr. 362). Plaintiff claimed compliance with her medications, but reported her blood sugar had been high all week. (Tr. 362). Her initial glucose test results were critically high. (Tr. 363). Plaintiff was admitted to the hospital, treated initially with IV fluids and insulin, and also with IV antibiotics "for probable sepsis due to the urinary tract infection." (Tr. 363).

---

[4] Used to treat high blood pressure.
http://www.drugs.com/search.php?searchterm=lisinopril(date last visited: November 19, 2014).

[5] Many of the medical records repeat throughout the administrative record. The Court will only reference its first review of the records, unless otherwise noted.

While treated at the hospital, her sugar, potassium, and sodium levels all returned to a normal range. (Tr. 364). A kidney ultrasound performed due to elevated creatinine levels showed no kidney obstruction. (Tr. 364, 366). A chest x-ray was also normal. (Tr. 368). Plaintiff was discharged three days later on October 19, 2009, with the diagnoses of diabetic ketoacidosis, urinary tract infection, obesity, chronic kidney disease, obstructive sleep apnea, and morbid obesity. (Tr. 364).

Plaintiff was admitted via ambulance to Bridgeport Hospital's ICU on June 1, 2010, with abdominal pain, nausea and vomiting for twenty four hours as a result of "stopping her insulin due to running out and not being able to afford to buy." (Tr. 295). Her modified fall risk assessment indicates an absence of depression. (Tr. 303). Upon admission, plaintiff was started on an insulin drip and her DKA[6] resolved within twenty four hours. (Tr. 295). Plaintiff's glucose measured a critical 959. (Tr. 295, 300, 306).  Other test results indicate elevated levels of mean platelet volume, potassium, iron, blood urea nitrogen, and creatinine. (Tr. 306). Plaintiff's tests showed low levels of sodium and chloride, and a critically low carbon dioxide level. (Tr. 306-07); see also Tr. 321-22 (reflecting blood test results over the course of plaintiff's admission, including a glucose level of 142 on June 3, 2010). A toxicology

_____

[6] Abbreviation for Diabetic Ketoacidosis, which is a "buildup of ketones in blood due to breakdown of stored fats for energy; a complication of diabetes mellitus. Untreated, can lead to coma and death." http://www.medilexicon.com/medicaldictionary.php?s=Diabetic+Ketoacidosis (date last visited: November 19, 2014).

screening showed plaintiff tested positive for cocaine. (Tr. 325). While at the hospital, plaintiff was in metabolic acidosis. (Tr. 306, 308). Plaintiff, noted as having "severe insulin dependent diabetes," was discharged two days later, on June 3, 2010, with the diagnoses of diabetic ketoacidosis, uncontrolled insulin-dependent diabetes, and morbid obesity. (Tr. 295). On discharge, she was instructed to resume her insulin and to adopt an 1800-calorie ADA diet. (Tr. 296).

Plaintiff was next admitted to Bridgeport Hospital on December 4, 2011 for renal failure/DKA. (See generally Tr. 446-524). Upon a physical examination at admission, plaintiff had high blood pressure and critically high glucose levels. (Tr. 454-55; see also 457-58). Laboratory tests also revealed high creatinine levels. (Tr. 457-58)  While admitted, she received a psychiatric consultation for "occasional fleeting suicidal ideation with no concrete plan." (Tr. 447-448). Plaintiff's urine toxicology screen showed evidence of recent cocaine use. (Tr. 447; see also Tr. 522). A bilateral renal ultrasound showed plaintiff's kidneys to be normal in size and echogenicity, but did reveal a "[b]ilateral simple cyst on the left lower pole." (Tr. 518). She was discharged on December 6, 2011. (Tr. 451).

### 2.   Dr. Urciuoli Treatment Records

An undated treatment record indicates that plaintiff was hospitalized in October 2009 for "mild DKA" and in June 2010 for "severe DKA." (Tr. 328). In February 2010, plaintiff's

hypertension was described as controlled. (Tr. 358-59).

In June 2010, plaintiff complained of low back pain. (Tr. 328). On June 25, 2010, plaintiff saw Dr. Urciuoli for a follow-up of her June 1, 2010 hospitalization. (Tr. 333-34). Plaintiff was uninsured but applying for SSI. On this date Dr. Urciuoli wrote a letter stating, "Nancy Pickett is under my medical care. She suffers from severe uncontrolled Type I Diabetes complicated by Ketoacidosis. She is disabled from doing any type of work for at least one year." (Tr. 327). At this appointment, plaintiff complained of blurry vision for the past week, which Dr. Urciuoli attributed to her diabetes. (Tr. 333). Plaintiff also complained of back and neck pain. (Tr. 333). Her blood sugar measured 120, and she had decreased vibratory sense in her right fifth toe. (Tr. 334).

Plaintiff had a physical examination on September 17, 2010. (Tr. 342). The exam sheet notes that plaintiff, weighing 300 pounds, has gained five pounds and complains of low back pain. (Tr. 342-43). Her general multi-systems examination was normal. (Tr. 343). On October 21, 2010, plaintiff presented with "unchanged" back pain. (Tr. 340). The treatment note for this visit indicates that plaintiff is compliant with her "meds" and insulin, but that she was not checking her blood sugar. (Tr. 340). Her blood sugar on this date measured 245. (Tr. 340); see also Tr. 373 (lab results dated October 19, 2010 reflecting elevated glucose and creatinine levels). Dr. Urciuoli noted

12

that plaintiff suffers from uncontrolled diabetes and increased her Lantus. He also urged her to check her blood sugar. (Tr. 340). As of this date, plaintiff weighed 306 pounds, a six pound gain from her last weigh-in. (Tr. 340-411).

A "Medication Monitor" reflects plaintiff's various medications from February 2008 through October 2010, including Humalog, Lantus, Lisinopril and Simvastatin. (Tr. 337; 405). Plaintiff's lab results are also tracked from November 2007 through February 2011. (Tr. 406-07). Notably, plaintiff's blood sugar levels were extremely inconsistent. (Tr. 406).

In November 2010 and February 2011, plaintiff saw Dr. Urciuoli for a follow-up of her diabetes and high blood pressure. (Tr. 408-10). Treatment notes generally reflect plaintiff's uncontrolled diabetes, high blood pressure, and obesity. (Tr. 408, 410). Plaintiff also complained of low back pain. (Tr. 410). A treatment note from April 2011 recorded that plaintiff was not checking her blood sugars. (Tr. 414). She is noted as having uncontrolled diabetes and renal disease. (Tr. 414). Plaintiff weighed 301 pounds. (Tr. 415). Plaintiff again saw Dr. Urciuoli on June 16, 2011, for pain in her left shin. (Tr. 430). It is noted there has been no change from April 7, 2011. (Tr. 430). The treatment note also references plaintiff's disability case with Binder & Binder and states, "Can't afford the $125 for narrative report [] told her I will charge only $60." (Tr. 430). Plaintiff saw Dr. Urciuoli on September 14,

13

2011, for a follow-up of her diabetes, obesity and high blood pressure. (Tr. 432). She complained of dizziness and pain in her legs and lower back. (Tr. 432). Although plaintiff reported taking her insulin, she stated that she does not monitor her glucose. (Tr. 432). She also complained of feeling lethargic, noting that she has no energy and "doesn't like to do things that she used to do […] feels depressed, feels in pain, eats poorly, unemployed." (Tr. 432). Plaintiff's diabetes was "uncontrolled" and she "does not monitor [] glucose, but stated she takes it irregularly." (Tr. 432). Her high blood pressure and hyperlipidemia are noted as controlled with medication. (Tr. 432).

### 3. Dr. Urciuoli State of Connecticut Medical Report 9/17/10

Dr. Urciuoli completed a medical report for the State of Connecticut, in which he opined on plaintiff's impairments. (Tr. 244-53).[7] He noted plaintiff's diagnoses of diabetes, hypertension, and "CKD"[8], which prevent plaintiff from working for twelve months or more. (Tr. 351). In response to how these diagnoses impact plaintiff's ability to work, he stated that she has difficulty standing, sitting and walking due to chronic low back pain. (Tr. 351). He further referenced plaintiff's height

---

[7] This report is also found at Tr. 381-399.

[8] Abbreviation for Chronic Kidney Disease.
http://www.medilexicon.com/medicalabbreviations.php?keywords=ckd&search=abbre
viation&channel=7201801445&client=pub-
1971793357249522&forid=1&sig=vptscazCworEUP7D&cof=GALT%3A%2300A12A%3BGL%3A1%3
BDIV%3A%23FFFFFF%3BVLC%3A800080%3BAH%3Acenter%3BBGC%3AFFFFFF%3BLBGC%3AFFFFFF%
3BALC%3A333399%3BLC%3A333399%3BT%3A44444%3BGFNT%3A00A12A%3BGIMP%3A00A12A%3BF
ORID%3A11&sa=Search (date last visited: November 20, 2014).

of seventy one inches and weight of 300 pounds. (Tr. 350). Dr.
Urciuoli also provided the following objective clinical
findings:

| Diagnosis | Supporting Symptoms | Objective Findings | Supportive Test Results |
|---|---|---|---|
| Primary: Low back pain | Constant low back pain | Decreased extension and flexion | none |
| Secondary: Diabetes | Blurred vision | Elevated blood sugar | Hemoglobin A/C = 12.9 |
| Secondary: Hypertension | None | Elevated BP | BP 160/80 |
| Other: Morbid obesity | Back pain, fatigue | Obesity | Wt 300 |

(Tr. 350). Dr. Urciuoli further opined that plaintiff could sit,
stand and walk for one hour in an 8 hour workday; continuously
lift up to 5 pounds, frequently lift 6-10 pounds and never lift
greater than 11 pounds; and frequently carry up to 5 pounds,
occasional carry 6-10 pounds, and never carry greater than 11
pounds.  (Tr. 349-50). Dr. Urciuoli identified no limitations in
the use of plaintiff's hands and feet. (Tr. 349). Plaintiff
further can never bend, squat, crawl or climb. (Tr. 349).
Plaintiff does not have any mental or substance abuse issues
that impact her ability to work. (Tr. 348). Finally, in
concluding his assessment, Dr. Urciuoli notes plaintiff's two
hospitalizations for diabetic ketoacidosis. (Tr. 344-45).

### 4.   Dr. Urciuoli Multiple Impairment Questionnaire 11/23/2010[9]

Dr. Urciuoli completed a Multiple Impairment Questionnaire
("MIQ") dated November 23, 2010. (Tr. 422-29). The MIQ notes

---

[9] Dr. Urciuoli's November 23, 2010 MIQ is also reflected at Tr. 438-445.

that Dr. Urciuoli has treated plaintiff on a monthly basis since February 12, 2008. (Tr. 422).  He notes plaintiff's diagnoses of uncontrolled diabetes, hypertension, chronic kidney disease, chronic back pain, and obesity. (Tr. 422). As to plaintiff's prognosis, Dr. Urciuoli notes that, "improvement expected in diabetes in the short term, but long term complications are likely." (Tr. 422).  He points to plaintiff's weight and elevated blood sugar and creatinine levels to support his diagnoses. (Tr. 422).  Plaintiff's primary symptoms are fatigue, low back pain, and blurred vision, which Dr. Urciuoli notes are reasonably consistent with plaintiff's physical impairments. (Tr. 423).  As to plaintiff's low back pain, Dr. Urciuoli reports that it is constant, neurologic and muscular in origin, and exacerbated by plaintiff's obesity. (Tr. 423-24). Movement and standing contribute to plaintiff's back pain. (Tr. 424). Dr. Urciuoli rates plaintiff's pain as a nine on a scale of zero to ten, with ten indicating severe pain. (Tr. 424).  Similarly, he rates plaintiff's fatigue as a ten on a scale of zero to ten, with ten representing severe fatigue. (Tr. 424).

Dr. Urciuoli also estimated plaintiff's RFC if she were placed in a competitive work environment on a sustained basis, finding that in an eight hour work day, plaintiff could only sit and stand/walk for 0-1 hour in day. (Tr. 424). Dr. Urciuoli further opined that it would be necessary or medically recommended for plaintiff not to sit or stand/walk continuously

16

in a work setting and that she must get up and move around every
twenty minutes. (Tr. 424-25). Dr. Urciuoli further opined that
plaintiff could frequently lift/carry 0-5 pounds, occasionally
lift/carry 5-10 pounds, and never lift/carry greater than 10
pounds. (Tr. 425). Dr. Urciuoli also found plaintiff has
"significant limitations in doing repetitive reaching, handling,
fingering, or lifting." (Tr. 425). Specifically, plaintiff has
moderate limitations in both extremities for grasping, turning
and twisting objects and using arms for reaching. (Tr. 425-26).
She has no limitations using her fingers/hands for fine
manipulations. (Tr. 426).

   Dr. Urciuoli notes that plaintiff's symptoms are likely to
increase in a competitive work environment. (Tr. 426). Her
symptoms are expected to last for more than twelve months, and
are frequently expected to interfere with her attention and
concentration. (Tr. 427). She is also incapable of tolerating
low work stress. (Tr. 427). Dr. Urciuoli notes that in an eight-
hour workday, plaintiff will need to take three fifteen minute
unscheduled work breaks. (Tr. 427). She is also expected to have
more than three absences from work per month. (Tr. 428). Other
limitations affecting plaintiff's ability to work on a sustained
basis include psychological limitations, a need to avoid
temperature extremes, and "no bending." (Tr. 428). Dr. Urciuoli
reported that plaintiff's symptoms and limitations date to
October 16, 2009. (Tr. 428).

### 5.   Dr. Urciuoli November 22, 2011 Letter

On November 22, 2011, Dr. Urciuoli wrote a letter addressing plaintiff's impairments. He notes that plaintiff has been under his care since February 12, 2008, and that she suffers from uncontrolled diabetes, chronic back pain, obesity, and chronic kidney disease. (Tr. 436). He states that laboratory testing has shown elevated blood sugar and creatinine levels. (Tr. 436).  He reports plaintiff's complaints of low back pain, fatigue and blurred vision, and further states that plaintiff has difficulty standing, walking and sitting due to  back pain. (Tr. 436). Dr. Urciuoli has prescribed plaintiff several medications, but she continues to experience pain and discomfort which inhibits her ability to perform. (Tr. 436). He then states,

> Due to her chronic back pain; [plaintiff] cannot sit for
> more than one hour and stand or walk for more than one hour
> in an eight hour workday. Her back pain also limits her
> capacity to use her upper extremities. Specifically,
> [plaintiff] should never lift or carry objects weighing
> more than ten pounds on more than an occasional basis.
>
> I believe that [plaintiff's] ability to sustain attention
> and concentration would be frequently interrupted by her
> symptoms of pain and fatigue. I would also anticipate that
> if she were to return to work she would miss at least three
> days a month as a result of her conditions. Additionally,
> [plaintiff] is precluded from activities involving bending
> and needs to avoid temperature extremes in order to avoid
> any exacerbation of her symptoms.
>
> It is my best medical opinion that [plaintiff's]
> debilitating impairments have rendered her incapable to
> returning to her past work or any other type of full time
> competitive work on a sustained basis since October 2009.

(Tr. 436-37).

18

6.   **Dr. Abraham Bernstein Disability Determination Explanation (initial level) dated August 16, 2010 (Tr. 52-65)[10]**

After reviewing medical records, Dr. Bernstein concluded that plaintiff suffers from the severe medically determinable impairment of diabetes mellitus. (Tr. 55). Considering the total medical and non-medical evidence of record, Dr. Bernstein found plaintiff partially credible. (Tr. 55).  Specifically, he noted that no medical evidence of record supported plaintiff's allegation of a history of kidney problems. (Tr. 55).  In his physical RFC assessment, Dr. Bernstein concluded that plaintiff had the following exertional limitations: could occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk and sit for a total of 6 hours in an 8 hour workday; and push and pull unlimited, other than the limitations shown for lifting and carrying. (Tr. 55-56).  Dr. Bernstein also identified the following postural limitations: plaintiff could occasionally climb ladders, ropes or scaffolds, crouch, and crawl; and frequently climb ramps/stairs, balance, stoop, and kneel. (Tr. 56).  No manipulative, visual, communicative or environmental limitations were identified. (Tr. 56-57). After an assessment of plaintiff's vocational factors, it was determined that plaintiff had the RFC to perform her past relevant work as a cashier, as it is actually performed. (Tr. 57). Ultimately, plaintiff was found not disabled. (Tr. 57-58).

---

[10] The Disability Determination Explanations for plaintiff's DIB claim (Tr. 52-58), and DI claim (Tr. 59-65), are identical.

**7.    Dr. Nabil Habib Disability Determination Explanation (Reconsideration) dated March 21, 2011 (Tr. 68-85)[11]**

On reconsideration, Dr. Habib considered new evidence from Bridgeport Hospital, Dr. Urciuoli, and DDS Hartford. (Tr. 69-70).  After reviewing medical records on reconsideration, Dr. Habib fully concurred with Dr. Bernstein's assessment, including RFC findings. (Tr. 72-73); see also Tr. 74 (emphasis altered) ("I fully concur with previous assessment. Compliance with meds. is an issue."). Dr. Habib also found plaintiff partially credible in light of "POOR COMPLIANCE WITH ME[D]ICATIONS RESULTING IN UNCONTROLLED DIABETES." (Tr. 72) (emphasis in original).  After an assessment of plaintiff's vocational factors, it was again determined that plaintiff had the RFC to perform her past relevant work as a cashier, as it is actually performed. (Tr. 74-75). Ultimately, plaintiff was found not disabled. (Tr. 75).

**D.   *Disability Reports (Tr. 201-210, 228-244, 280-286)***

In an undated adult disability report, plaintiff lists the following medical conditions that limit her ability to work: diabetes, kidney problems, stomach trouble, and back pain. (Tr. 202).  At the time of this report, plaintiff weighed 200 pounds and measured six feet tall. (Tr. 202). Plaintiff reports taking the following medications: Humalog, Insulin and Lantus for diabetes; Lisinopril for high blood pressure; and Simvastatin

---

[11] The Disability Determination Explanations - Reconsideration for plaintiff's DIB claim (Tr. 68-76), and DI claim (Tr. 77-85), are identical.

for high cholesterol. (Tr. 206). Plaintiff denies having
received medical treatment for any mental conditions. (Tr. 206).
Plaintiff indicates that she stopped working on May 17, 2010,
"because of other reasons," namely, she "was accused of doing
something I did not do, I was calling sick a lot and could not
continue working." (Tr. 202). Plaintiff's job as a cashier at
Stop and Shop was her only employment in the past fifteen years.
(Tr. 203).  At this job, plaintiff stood and handled large
objects for five hours per workday, reached for four hours per
workday, and wrote, typed, or handled small objects for one hour
per work day. (Tr. 204). Plaintiff also reports frequently
lifting less than ten pounds during this job, and that the
heaviest weight she had lifted was twenty pounds. (Tr. 204).

    Plaintiff reports in an appeal disability report from
August 23, 2010[12] that there has been no change in her condition
since last completing a disability report. (Tr. 229). Plaintiff
also denies the onset of any new physical or mental limitations.
(Tr. 229-30).  Plaintiff notes that since her last disability
report she has treated with Dr. Urciuoli for brittle diabetes
impairment[13], severe back pain, hypertension and high
cholesterol. (Tr. 230). Plaintiff also notes an admission to
Bridgeport Hospital for brittle diabetes impairment. (Tr. 231).

---

[12] This report is substantively duplicated at Tr. 239-244.

[13] The term "'brittle diabetes' is reserved for those [Type 1 diabetes] cases
in which the instability, whatever its cause, results in disruption of life
and often recurrent and/or prolonged hospitalization[…]."
http://www.ncbi.nlm.nih.gov/pubmed/17072232 (date last visited: November 19,
2014).

21

Although plaintiff states that she is taking medications, she fails to list them. (Tr. 232). Finally, plaintiff reports that she "can care for [her] personal needs, however at a much slower rate of time with [great] pain and difficulties. (Tr. 233).

In a second appeal disability report, plaintiff reports no change in her condition since the date of her last disability report, September 14, 2010. (Tr. 282). She also denies the onset of any new physical or mental limitations. (Tr. 282).

### E.   Other Evidence of Record

#### 1.   Work History Reports (Tr. 187-200, 211-227)

In an Employee Work Activity Report dated June 14, 2010, plaintiff reports having worked fifteen hours per week at Stop and Shop as a cashier from April 1988 through May 2010. (Tr. 189-200). Plaintiff reports not receiving "special help on-the-job." (Tr. 191).[14]

In a Work History Report dated July 19, 2010, plaintiff confirms that she worked as a cashier at Stop and Shop from April 1988 through May 2010. (Tr. 211-227). Plaintiff reported only working four to five hours per day, three or four days per week. (Tr. 212). In this job, plaintiff "rang up" customers' bills, bagged groceries, and lifted groceries into carriages. (Tr. 212). She stood for four to five hours per shift, with a fifteen minute break to sit. (Tr. 212). Plaintiff also lifted large bulk items, such as cases of soda and pet food, and

---

[14] Although plaintiff worked after her alleged onset date, SSA determined that her earnings fell under the substantial gainful activity limit. (Tr. 197).

22

estimates that she lifted at the heaviest, twenty pounds. (Tr. 212).

### 2. Representative Briefs (Tr. 288-89, 292-94)

Plaintiff's attorney submitted a memorandum dated December 29, 2011, in support of her claim for social security disability and supplemental social security disability benefits. (Tr. 288-89). The brief summarizes the medical evidence of record and contends plaintiff is disabled on account of uncontrolled diabetes, chronic back pain, hypertension, obesity, and chronic kidney disease. (Tr. 288). Plaintiff's representative also submitted a brief to the Appeals Counsel dated July 26, 2012 in connection with her appeal of the ALJ's unfavorable decision. (Tr. 292-94). In this brief, plaintiff contends the ALJ erred by failing to properly assess her mood disorder; failing to evaluate the opinion evidence of record; and failing to properly assess her RFC. (Tr. 292-94).

## IV. THE ALJ'S DECISION

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1)(E). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected… to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Determining whether a claimant is disabled requires a five-

step process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. See 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(c). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, at a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. § 404.1520(e)-(f). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20

C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80
(citations omitted).

The Commissioner may show a claimant's Residual Functional
Capacity by using the Medical-Vocational Guidelines set forth in
the SSA Regulations ["the Grid"]. See 20 C.F.R. § 416.945(a)
(defining "residual functional capacity" as the level of work a
claimant is still able to do despite his or her physical or
mental limitations). The Grid places claimants with severe
exertional impairments, who can no longer perform past work,
into employment categories according to their physical strength,
age, education, and work experience; the Grid is used to dictate
a conclusion of disabled or not disabled. A proper application
of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments;
nonexertional impairments, including psychiatric disorders, are
not covered. See 20 C.F.R. Part 404, Subpart P, App. 2, 20
C.F.R. § 200.00(e)(1). If the Grid cannot be used, i.e., when
nonexertional impairments are present or when exertional
impairments do not fit squarely within Grid categories, the
testimony of a vocational expert is generally required to
support a finding that employment exists in the national economy
which the claimant could perform based on his residual
functional capacity. See Pratts v. Chater, 94 F.3d 34, 39 (2d
Cir. 1996).

Following the five step evaluation process, ALJ Horton

25

concluded that plaintiff was not disabled under the Social
Security Act. (Tr. 16).  At step one, the ALJ found that
plaintiff had not engaged in substantial gainful activity since
January 1, 2009, the alleged onset date. (Tr. 20).[15]  At step
two, the ALJ found that plaintiff had severe impairments of
insulin dependent diabetes mellitus, low back pain, and obesity.
(Tr. 20). The ALJ also found that plaintiff's chronic kidney
disease, hypertension and depression were not severe
impairments. (Tr. 20-21).

At step three, the ALJ found that plaintiff's impairments,
either alone or in combination, did not meet or medically equal
the severity of one of the listed impairments in 20 C.F.R. Pt.
404, Subpt. P, App. 1. (Tr. 21). Before moving onto step four,
the ALJ found plaintiff had the residual functional capacity
("RFC") to perform the full range of light work as defined in 20
C.F.R. 404.1567 (b) and 416.967(b). (Tr. 14).  In making her RFC
determination, the ALJ considered plaintiff's treatment history,
which the ALJ found to be "intermittent," and "minimal [] on a
very sporadic basis." (Tr. 21-23). The ALJ further noted that
plaintiff generally does not follow her prescribed treatment.
(Tr. 21-23). The ALJ also considered the plaintiff's description
of her functional restrictions, and found that description
inconsistent with the weight of the entire record. (Tr. 21).  At
step four, the ALJ found that plaintiff is capable of performing

_____

[15] As noted above, it appears plaintiff amended her alleged onset date to May
1, 2010. The ALJ's decision fails to reflect this.

26

past relevant work as a supermarket cashier. (Tr. 24).
Ultimately, the ALJ found plaintiff not disabled. (Tr. 24).

**V.   DISCUSSION**

On appeal, plaintiff asserts the following arguments in
favor of reversal or remand: (1) the ALJ failed to follow the
treating physician rule; (2) the ALJ failed to properly evaluate
plaintiff's credibility; and (3) the ALJ failed to adequately
consider plaintiff's obesity.

Plaintiff's contention that the ALJ failed to follow the
treating physician rule raises a brief argument that the ALJ's
RFC finding is not supported by substantial evidence. [Doc. #13,
10-11]. In response, defendant argues that, "Both State agency
physicians in this case, Dr. Bernstein and Dr. Habib, opined
that Plaintiff could perform light work[.]" [Doc. #17-1, 7].
Defendant further argues that because "the ALJ properly rejected
Dr. Urciuoli's opinion as inconsistent with and unsupported by
the medical record, including Dr. Urciuoli's own treatment
notes[,] [] the ALJ was entitled to rely on the only other
medical opinions in the record to support the finding that
plaintiff could perform light work." In reply, plaintiff asserts
that because the ALJ did not give any weight to the opinions of
Drs. Bernstein and Habib, the Court cannot rely upon them to
affirm the ALJ's decision. [Doc. #18, 2].

"The regulations clearly require an ALJ to 'evaluate every
medical opinion.'" Duell v. Astrue, No. 8:08-CV0969, 2010 WL

27

87298, at *5 (N.D.N.Y. Jan. 5, 2010)(quoting 20 C.F.R.
§416.927(d)).  The regulations also mandate that, "Unless a
treating source's opinion is given controlling weight, the
administrative law judge <u>must</u> explain in the decision the weight
given to the opinions of a State agency medical or psychological
consultant […], as the administrative law judge must do for any
opinions from treating sources, nontreating sources, and other
nonexamining sources who do not work for us." 20 C.F.R.
§404.1527(e)(2)(ii) (emphasis added); <u>see also</u> <u>Stytzer v.</u>
<u>Astrue</u>, No. 07-CV-811, 2010 WL 3907771, at *7 (N.D.N.Y. Sept.
30, 2010)(same).

Here, the ALJ found that plaintiff has the residual
functional capacity to perform the full-range of light work as
defined in 20 C.F.R. 404.4567(b) and 416.967(b). (Tr. 21). In
making this determination, the ALJ considered the opinions of
Dr. Urciuoli, but declined to provide these opinions controlling
weight because they are "not consistent with his own treatment
records." (Tr. 22); <u>see also</u> Tr. 23 ("Dr. Urciuoli's various
opinions are given due consideration but are not given
controlling weight as they are inconsistent with his own minimal
treatments notes, which do not reflect in any way the
restrictions set forth in these opinions."). Noticeably absent
from the ALJ's decision is any discussion of the weight assigned
to the State reviewing examiners' opinions. It is further
unclear whether the ALJ considered the relevant factors in

28

assessing the merit of these opinions. Moreover, the ALJ's opinion fails to even reference these opinions.

Because the ALJ did not give the opinions of plaintiff's treating source controlling weight, the ALJ was "obliged to consider all of the [listed] factors in deciding the weight [to] give any medical opinion,' 20 C.F.R. 416.927(d), and to explain the weight given [to Drs. Bernstein and Habib's opinions]." Duell, 2010 WL 87298, at *5 (citing 20 C.F.R. §416.927(f)(2)(ii)[16]). The ALJ's failure to do so was legal error and necessitates remand. Richardson v. Barnhart, 443 F. Supp. 2d 411, 425 (W.D.N.Y. 2006); see also Gorea v. Colvin, No. 6:12-CV-0854(CTS), 2013 WL 4832574, at *6 (N.D.N.Y. Sept. 10, 2013) (citing Richardson, 443 F. Supp. 2d at 425)("Unless controlling weight is given to the opinion of the treating physician, an ALJ's failure to explain the weight given to the opinion of other treating sources or a State agency medical consultant is legal error."); Duell, 2010 WL 87298, at *5 ("The ALJ's failure to consider the relevant factors and explain the weight afforded to the medical opinions from consultative physicians and psychologists constitutes legal error and necessitates remand."); Ealy v. Colvin, No. 5:12-CV-0640(GTS), 2013 WL 4083239, at *6 (N.D.N.Y. Aug. 13, 2013)(remanding case where ALJ failed to give controlling weight to plaintiff's treating physician and did not specify the weight given to opinion of state agency consultant).

---

[16] Now codified at 20 C.F.R. §416.927(e)(2)(ii).

The Court is cognizant that the ALJ is "not required to mention or discuss every single piece of evidence in the record."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 78-79 (N.D.N.Y. 2005) (multiple citations omitted). Indeed, where "the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not required to explain] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983). However, the regulations are clear that where, as here, the treating physician's opinions are not afforded controlling weight, the ALJ must explain in the decision the weight given to the opinions of a State agency medical consultant. In that regard, "section 416.927[(e)] requires an ALJ to consider [non-examining source] opinion evidence in the context of other evidence in the record, the consistency of the of the non-examining doctor's findings with the opinions of the treating doctors, and the specialty of the non-examining doctor." Rodriguez v. Astrue, No. 07 Civ. 534 (WHP)(MHD), 2009 WL 637154, at *25 (S.D.N.Y. March 9, 2009)(citing 20 C.F.R. §§416.927(a)-(e)). Here, the ALJ undertook no such consideration and the resulting "inadequacies in the ALJ's analysis frustrate meaningful review." Chichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013); see also Adesina v. Astrue, No. 12-CV-3184(WFK), 2014 WL 5380938, at *11 (E.D.N.Y. Oct. 22, 2014)(citations and internal quotation marks

omitted)("The ALJ's failure to explain how the evidence supported the RFC finding she reached frustrates meaningful review, and remand could be appropriate on this basis alone."). Therefore the Court has no choice but to remand this matter for further administrative proceedings.

In light of the Court's findings above, it need not reach the merits of plaintiff's remaining arguments. Therefore, this matter is remanded to the Commissioner for further administrative proceedings consistent with this Ruling. On remand, the Commissioner will address the other claims of error not discussed herein, as well as plaintiff's amended alleged onset date.

## VI.  CONCLUSION

For the reasons stated, plaintiff's Motion to for Judgment on the Pleadings **[Doc. #12]** is **GRANTED** and the Commissioner's Motion to Affirm is **DENIED [Doc. #17].** This matter is remanded to the Commissioner for further proceedings in which the ALJ evaluates and explains the weight to be given to the non-treating physician opinions.

This is a Recommended Ruling. See Fed. R. Civ. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of being served with order.  See Fed. R. Civ. P. 72(b)(2).  Failure to object within fourteen days may preclude appellate review.  See 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b); and D. Conn. L. Civ.

R. 72.2; <u>Small v. Secretary of H.H.S.</u>, 892 F.2d 15 (2d Cir. 1989)(per curiam); <u>F.D.I.C. v. Hillcrest Assoc.</u>, 66 F.3d 566, 569 (2d Cir. 1995).

The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the Magistrate Judge who issued the Recommended Ruling in this case, and then to the District Judge who issued the Ruling that remanded the case.

Dated at Bridgeport, this 23rd day of February 2015.


\_\_\_\_\_/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE